on the docket this afternoon. It is case number 24-30640, Associated Professional Educators of Louisiana v. EDU20 et al. We will hear first from Mr. Stokes. May it please the Court. I would first like to start addressing my client's Lanham Act claims and the District Court's finding on summary judgment that there was no likelihood of confusion. Part of the reason we requested oral argument in this case is a picture truly is worth a thousand words. It's very difficult in the briefs to explain what the pictures I think show for themselves. We have some demonstratives all based in the record. These are the actual pictures of the PowerPoint slides in question. We've numbered them for ease of reference and I will identify which numbers I'm speaking about. I'd like to start out just by looking at these. Again, these are all on the record. If you look at Demonstratives 1 and 2, these are PowerPoint slides that were presented by the Defendant LLC EDU2020 at what's called Teacher Leader Summit, which is actually held in New Orleans. It is educators and administrators from all over the state come and it's an opportunity for vendors to market their services to these school districts. Slides 1 and 2, and I'm laying them side-by-side, I'll start with 1. 1 was presented by Miranda Britt, who was in fact a former employee of my client. She was presenting this, again, on behalf of EDU2020, even though my client I'll refer to as Apple knew she was there representing it as well. If you look at slide number 1, you can see Apple's logo there in the top, exactly in the center of the top. It says A-Plus P-E-L. I do want to point out, this is what the District Court referred to as a biographical slide. I don't know that there's evidence in the record that would support that characterization, but for ease of reference, that's what we'll call it today. The District Court found this was a biographical slide and therefore no likelihood of confusion, but I do want to point out visually a couple of things that I think are striking. First of all, if you note, again, she's presenting this on behalf of EDU2020, but you look and she has her Apple title. She was employed at the time, keep in mind this is while she was employed during 2021, May of 2021, and it has Deputy Director of Apple 2014 to present. Right across from that, you move over a little to the right, there's the Apple logo. You move over a little bit further to the right and finally we see the EDU2020 logo. So, I would note for the panel that I do think it's interesting. She's giving a presentation, Marketing Services on behalf of EDU2020, unbeknownst to my client, and the first logo that she lists is her current employer. And she actually gives her title to her current employer, not her title with the new, what I'll call the new company, EDU2020. Then if you look at the color scheme and you look at how these are matched up, so you see Miranda Britt there, her name, is in very similar blue to the EDU2020. And then you see the Deputy Director of Apple matches the green in Apple, but there's also the green in EDU2020. So, just visually comparing these, you know, if an attendee is looking at this and there's no disclosure, you know, that Apple doesn't know about this, Apple hasn't authorized this, just looking at this, I think this tells a lot about what an average attendee would be looking. And then if you compare that to slide two, which interestingly enough was presented at the same Teacher Leader Summit, it was a different presentation, and this time Ms. Britt was presenting again on behalf of EDU2020, but she was with her two partners, her wife and a third partner, Ms. Shannon Street. And interestingly, now we see that same conference, different presentation, now we see that Apple's logo is still used, but it's in the center, it's sort of buried down a little bit, again I'm on two, and EDU2020 is right next to it. And then you see her title here, Senior Director of Partnerships. So, you have a situation where a current employee, and she's known, all this is in the record, she's known as an employee of Apple, she's a Deputy Director of Apple, is presenting for a competing company unbeknownst to my client, she's using Apple's logo, and she has this word partnerships in it. And again, if you're an attendee, and none of this is disclosed, and you're just looking at this, an attendee might form some conclusions about associations or endorsement or affiliations, which is all language from . . . But you used the word might, what evidence is there that they were actually confused by the placement of those logos? Great question. So, for this presentation, the evidence that's in the record is, there was a representative of the Department of Education, Rachel Bunch, and she emailed Ms. Britt at her Apple email address to ask if EDU2020, the defendant, could do some work. So that's some evidence of actual confusion. I would also say that Ms. Britt admitted in her deposition that it's possible that attendees might be confused by this, so her own admission that this could potentially be confusion. Those are the evidence for these two slides. We actually have a little more concrete evidence, and I'll move on to the third and fourth slides to your question, Judge Douglas. The third and fourth slides were not at Teacher Leaders Summit. They were done, I believe, the third slide, I want to make sure I say this correctly, was done, again, an EDU2020 presentation, was done for West Feliciana School District. The superintendent, Haas Milton, of the West Feliciana School District actually approached Ms. Britt at Teacher Leaders Summit about doing this presentation. So, if you look at slide three, this is what Ms. Britt, in her presentation, this is about a month later, I believe it was June 16th, 2021, so the next month. Now, she has Miranda Britt, Senior Director of Partnerships. She has EDU2020. Now, the Apple logo is moved up. It's not right next to her name, but again, if you look, it's on the same level as EDU2020. Ms. Britt admitted in her deposition that she did not disclose to Dr. Corville, who is the Executive Director of my client, that she was doing this presentation. She admitted that she intentionally kept it from him. I forget her wording, but it was something like it would have been uncomfortable or awkward to talk to him about this. I'm paraphrasing. It was something along those lines. So, she's secretly doing this, and by the way, this is all in the record. She also, when she gives presentation number three, she's sitting in the parking lot before she goes in and gives this presentation. She emails my client and says, hey, I need to take some of my personal leave because I have some personal things I need to attend to, and about 20 minutes later, she gives this presentation. She did not disclose that she was doing this. Based at this number three presentation, the West Feliciana, we have a declaration from a gentleman by the name of Torrence Williams. Torrence is now, and this is important because I believe, in my opinion, the district court may have been confused about this. Torrence was not an employee of Apple at this time. He is an employee now. He was subsequently hired, and the district court found his declaration to be self-serving and conclusory, and we disagree with that, and we'll get to that in a minute, but Mr. Williams did say in his declaration that he attended this, he observed this slide, he heard other attendees talking about the fact that Ms. Britt was employed with Apple, and he assumed, based on these facts, that there was some sort of affiliation or endorsement between these two. Then if we move to slide number four, the final one, and slide number four was done about a month later on July the 13th, 2021. Again, this is an EDU 2020 presentation, and again, this is actually an Apple client. It was done for the Cattahoula, it's called the Cattahoula Leadership Academy for the Cattahoula Parish School District here in Louisiana, and you look, and again, we see the same thing, Miranda Britt, Senior Director of Partnerships, and then we see, very similar to slide three, we see the sort of Apple-level treatment of the two logos. So is it your contention that the placement of the logo on the PowerPoint presentation makes a difference? Yes, Your Honor. I believe it shows intention. If the Apple logo was closer to the Bates number as the Go Tigers logo, then your argument would be? I believe the shifting of the, what I'm, I believe the moving around of the logo over these four presentations shows a very specific intentionality to how we wanted to present the different logos. I think that's evidence on summary judgment, or at least creates a genuine issue of material fact, that there was some intentionality. In other words, this wasn't just slapdash, this wasn't just, we were just throwing it together. If you look, as the logo moves around, I think it shows intentionality on their part. Another piece of the record, I believe this was Ms. Britt's wife, Ms. Dumas, Dumas admitted in her deposition that they, there were some logos that they didn't use because of the, my words, icky affiliation with it. So again, I think that just goes to the intentionality and the intent behind how they were using these logos. But what is the relevance of intent? I thought the question for the Lanham Act claims is likelihood of customer confusion. It wouldn't really go to her subjective motivation or ickiness or whatever it is that you have. Right. I believe the relevance of intent, if you look at the likelihood of confusion factors, I believe, and I'm trying to find the number, Your Honor, I will tell you, I believe the intent is factor number. Oh, are you talking about the eight factor test that we've come up with? The likelihood of confusion. Yes, Your Honor. I'm trying to find, it's, it's factor number six, Your Honor. And, and I, now that we're talking about the likelihood of confusion analysis, I do think it's now a good time to point out that the district court did not consider any of these factors except for actual confusion. And of course, actual confusion, Lanham Act does not require actual confusion. It requires the likelihood. Is it likely that someone could be confused? And of course, actual confusion is one way to prove that. And I believe that's, in fact, factor seven, but it is not dispositive. And the district court apparently seemed to just say, look, there was no confusion, i.e. actual confusion dismissing your claims. In the record, we, we, on summary judgment opposing defendant summary judgment, we went through the factors and there are facts in the record that would support all of this. Let me make sure I followed your, your, the declarations or depositions you said that were the best in response to Judge Douglas. So you, you had Torrance Williams who attended with, did I do June 16th, 2021? That's slide three? Yes, Your Honor. And then we have another declaration from Tia Neal. Neal, exactly. That was number four. Which is July 2021. Yes. Yes, Your Honor. The district court, again, we believe it was legal error to just focus on actual confusion. But even looking at the actual confusion, we think we have some evidence of it based on those declarations. The district court disregarded these declarations because he found they were conclusory or self-serving. And of course, we cited in our brief and I know the court is well aware of the law that, you know, just because a, an employee of a company signs a declaration, of course it's going to inherently be self-serving. But that's not, that's not the test. Something can be self-serving and still be admissible as certainly on summary judgment. The test is, is it conclusory? Is it, or is it contradicted by other things? You know, overwhelming amount of evidence in the record, neither of which apply here. Both declarants went through and laid out facts of what they observed and how they reached their conclusions, both Ms. Neal and Mr. Williams. And they, they both set forth facts to establish their personal knowledge. And I would also note to the panel that, you know, there is some, also some language in the case law when you're talking about self-serving affidavits. If the fact can be proven really no other way, then the affidavit or the declaration is going to be the only way that you can do that. So here they're talking about their subjective belief of what they assumed in terms of an affiliation. Quite frankly, I don't know how else my client would prove that but for someone attending and saying, here is what I understood to be true. So I, we think it was also error for the district court to disregard, certainly on summary judgment, to disregard and just essentially discount. And the final thing I, I would show you, and this is just, this is just a quote from the district court. Um, and I think it really does highlight the district court's errors. And this is on the memory and I'm, I'm just quoting and of course I won't read the whole thing. I know the panel can read for themselves, but I do think it's important to note here, to me this is a microcosm of the district court's error. It says, while it may have been confusing, uh, it puts it in quotes, to two industry players, William and Dr. Neal, whether Britt was presenting on Apple's behalf or Edu's 2020's behalf. The mystery apparently did not stem from her use of Apple's mark on one biographical slide. That's an error, therefore. Um, but rather that the actually confused declarants knew Britt was employed with Apple at that time. So in other words, he's saying, well, their confusion was because she was employed. That's exactly our point. I don't think you can look, in the case, the law does not back this up, you cannot look at confusion in a vacuum. I think you have to look at the totality of the circumstances of what's going on. I believe the jurisprudence supports that. And so if you look at here, you have a current employer and I believe my time is up, so. You've saved time for rebuttal. Okay, thank you. Um, we'll hear next from Mr. Drell. Good afternoon, Your Honors, and may it please the Court. Um, I too will start with the Lanham Act claims as well. And, um, again, we have noticed and agreed that, um, there's almost no evidence of a likelihood of confusion. And what we're talking about here, uh, is two declarations that, uh, were both signed by Apple employees. Uh, and in the record also is that Tia Neal, even though she wasn't employed at the time, she was an independent contractor for, uh, Apple. And that's found at the Record on Appeal at, uh, 719-725. Um, but more importantly, and I think we can sum this down, uh, whether or not those slides were confusing, for purposes of a damages claim under the Lanham Act, we have no evidence of commercial damage, that they actually lost any business, or that any actual customers were confused. And there's no evidence that Ms. Neal or Mr. Williams were actual potential customers of Edgy 20 or Apple. Um, and there's also no evidence that supports the need for injunctive relief. I think the likelihood of confusion standard relates to that, uh, where you're going to enjoin someone's use of a logo. But the record reflects in the deposition testimony that they will never be using this logo again after having to endure this litigation. I want to then turn to the trade secrets claims, uh, mostly because, um, I think this can be pretty easily handled. The things that were claimed by Apple to be trade secrets is first a client list that the court found were made up of Louisiana school districts, and that are publicly known because all those contracts are public record with both the local school boards and the Louisiana Department of Education. More importantly, the customer list is not in the summary judgment record. It's not in the record at all. And the assertions by, uh, by Apple in Dr. Corbill's declaration that, oh, I had this super-secret list that had super-secret contact information that nobody else had, all we have is a declaration. We don't actually have the actual list. Uh, the mentor teacher material. That was something that you sought in discovery, is that right? Say again? That was something that you sought out in discovery, is that correct? Yes. And the list we got did not have any of that contact information in there, and so that's why it's not in the record. Uh, the mentor teacher materials is the, uh, second trade secret that was claimed by Apple. However, the mentor teacher materials were derived from Louisiana Department of Education's open source curriculum on mentor teacher. Now, as a bankruptcy lawyer most of the time, I had to learn all this educational jargon, and just to clarify for the court, what mentor teacher is, is a program to train teachers to have student teachers in their classrooms and learn from them how to teach. And this is a curriculum that, uh, Apple developed to be taught online, and these materials were presented to audiences under no confidentiality, uh, obligation. But more importantly, there's no evidence in the record that Edu2020 ever did a mentor teacher program, and they haven't. Um, and so there's no evidence of either use of these materials or of commercial value that Edu2020 received that Apple could have a claim to recover. Um, now as to the state law claims, uh, they were seeking damages for, they failed to make a but-for causal connection to the alleged wrongdoing as far as what their damages were, and so those claims for luta and breach of fiduciary duty as to the use of the logo and any of the alleged intellectual property also was properly dismissed. Um, so lastly I want to turn to, um, the district court one, uh, remanding the remaining claims back to state court. Uh, Apple claims that this is, creates a procedural conundrum. No, it really does not. Uh, there is a suit already pending in the 19th Judicial District Court in Baton Rouge that encompasses those claims and can easily move forward. Uh, then lastly, the district court properly denied Apple's summary judgment motion, uh, on the breach of fiduciary duty claim because questions of Britt's subjective intent and subjective belief precluded summary judgment. There was also a lack of a clear Apple policy on outside employment and a lack of evidence of harm to Apple. I welcome the court's questions. Counsel, I've got a couple of questions on the Lanham Act. Um, so we talked a little bit with your friend on the other side about, um, the intentionality factor, um, and the intentionality that can be inferred from the way that Ms. Britt, um, did these, um, arranged these four presentations, so I'd like to hear your response to that. But maybe I'll get out all my other questions about the factors and you can take these in whatever order you want. Um, the second factor in our eight factor test is similarity of the marks. Um, I assume you're going to agree with me that the marks are very similar, similar color schemes, similar, um, I mean, all of that color is the same, they're next to each other, they look similar. Um, similarity of the products, I gather that Apple and Edu2020, um, you know, they, um, are presenting these presentations at these conferences, um, so I assume that the similarity of the product, I'm sorry, the products that they offer is one factor, which obviously they're in the same market, they're competitors, so that, that one seems to be met. Um, industry, I'm sorry, the identity of the advertising materials, that's what I meant earlier, which is that, that seems like the business models for both of these companies are roughly the same, which is that, I gather you go to these conferences and you make the PowerPoint presentations like Ms. Britt did, so that seems to favor her. And then actual confusion, she has two declarations from people who actually attended the conferences and said that the marks were part of their confusion about the identity of both the companies and who she was representing and who she was working for. So, help me walk through one or all of those factors and why they're not a problem for you. All right. Um, I don't think we're really talking about confusion between the Edu2020 mark and the Apple mark. I think the issue that Mr. Stokes raised is the Apple mark was on her bio slide and it's an affiliation claim. We don't deny that that is Apple's actual logo. So, we can move on from that. She uses that one, so that, that's all that matters for that factor. Right. I mean, I think, I think, yep, she put it on her bio slide and some of it is, and you'll notice that these bio slides sometimes are repetitive. Um, she was often a very last minute person putting together these presentations. Just, uh, you could tell that from her deposition. And, um, you know, she was with her wife, cause this is really her wife's business, Courtney, uh, Dumas. This is really, you know, she came up with the idea. She was sort of the push behind the tier one curriculum trap book, which that was sort of the impetus for starting this business and doing these presentations that, and there's a educator named Jill Jackson that has a lot of materials that they have contractual rights to do, uh, to, to present on. And as far as advertising, um, I don't really think there's a lot of advertising. Let me walk the court through how this works. Uh, for public schools in Louisiana, you have to be an approved vendor by the Louisiana Department of Education that says, okay, you can teach this history curriculum or this English language arts curriculum or this math curriculum, and you have to send the stuff to LDOE and they go through your stuff and then approve it. And then, there's really not much in the way of advertising. School districts go to the vendor guide and say, I need somebody to train my teachers on English language arts or something like that. And if they're approved and they, and if they know the person because they've seen them present before, then that's a whole different thing. The other thing is, is that, you know, when I talk about the evidence of damages part, you know, so much of the business was driven by Courtney Dumas because she previously worked for instruction partners, left instruction partners, and started her own company doing the same thing. Now, will I admit that they are competitors? Yes and no. They are not all approved in the same areas in the LDOE vendor guide. Um, and for example, as I've said in my earlier argument, we've never done mentor teacher. And that's sort of Apple's pinnacle training because they really pioneered that. And we haven't, or EDU 2020 hasn't done that. And so, are they competitors? I mean, do they generally do the same things? Yes, but you have to kind of look at what areas in the LDOE vendor guide to determine if they really are competitive. And again, as to the two declarations, there's no evidence that those are potential customers that were confused. It's just potential confusion. You'd have to show potential customers were confused. And who would you call the customer? The school districts. So if . . . And LDOE. So, but it would be people who are seeing these . . . I thought that what you said earlier was that the way the market works is that you need educational instruction for your teachers. You go to the guide. You see if they're approved. If it's somebody you've seen present before, then yeah, you go with them. So, wouldn't that suggest that someone who saw these PowerPoint decks would be one of the customers, or is potentially one of the customers? It's sort of pitched at people to say, hey, the next time you need to have instruction on X, Y, and Z, call me. Well, potentially, if . . . Here's the thing. Apple did not show any overlap between the instructional things that they provided versus the instructional things that EDU2020 provided. That's just not in the record. They didn't really show where we overlapped. And the things they said overlapped, like mentor-teacher, in fact do not. And so that would be my argument on that point. So it could be potential customers, just not potential competitive customers, right? That is, somebody who's choosing between Apple and EDU2020. Yeah, I mean, I don't . . . There's no evidence that there were actual customers making that choice or were confused and said, ooh, I thought I was hiring Apple, but I hired EDU2020 instead. There's no evidence of that in the record. And more importantly, there's no evidence of any damages or injunctive relief. And your question was very long, and I'm not sure which . . . I think you got it. I think that was it. So it was similarity of the marks, similarity of the products, identity of the advertising materials, and then actual confusion. So those are the four that I was questioning.  Thank you. Anything else? Thank you. Very good. Thank you, counsel. All right. Mr. Stokes, you have five minutes reserved for rebuttal. Thank you. Just very quickly, just a few points. During the counsel for Apple's talk, he talked about the Defend Trade Secret Act, and I do want to clear up a few disagreements I have with his characterizations. When he talked about, for example, Mentor Teacher, which is one of the trade secrets at issue here, or alleged trade secrets at issue here, we're alleging, that he said that it was an open-source curriculum. And I do want to clarify that because that is not entirely accurate. What the Department of Education did is they had essentially templates, and they offered it to the vendors, and there was an application to be Mentor Teacher certified, and there was a template of the general curriculum, but they were reliant upon their vendors to actually input their own knowledge and expertise when they're actually providing the training. So in other words, this is not a case where Apple or any other Mentor Teacher provider was simply taking materials that the Department of Education developed without touching them, and then using them. That's not what was happening here. They were general templates, and then each provider, and in fact, in the application process, I did think this was interesting, and I'll give you the record site. This is in the record at 2817. This is part of the Department of Education's Mentor Teacher application guide, and I did think it was very interesting on 2817, they're asking the potential vendors, such as Apple, quote, how will you execute Mentor Teacher training? So they're wanting Apple or any potential vendor to say, how are you going to do this and incorporate it, and what materials are you going to use? Second quote, again on 2817, how will you integrate the Mentor Teacher assessment series into your training? These are questions that the applicant had to fill out. Another, same page, will you use the Department of Education's open source Mentor Teacher training materials? And if you intend to, outline the scope and the sequence for each module. So this is not a situation where they're simply just taking some papers and going and presenting. I mean, there would have no commercial value to that if this was just open source. And of course, you know, the cases say when we're talking about a trade secret, the definition of trade secret, and you have to start there in the statute, is defined very broadly. All kinds of things can meet that. But the cases that discuss when you're using publicly available information, the cases say that's okay if you expend time, resource, and effort into compiling that information. Think of a customer list with specific points of contact, which we have at issue here. Mentor Teacher is a perfect example. You're taking a piece of information that's publicly available, and then you're plugging it in to, you know, you're making it your own, much like an attorney would in a brief. You know, the final brief that you see, of course, is not all the thought and mental impressions that we had. So I did want to mention that. Counsel also mentioned that there was no evidence of use, and this is a point of clarification. Again, I think we have to go back to the statute. And the Defend Trade Secrets Act, actually, it of course has the word use, but that's not the only way. So the triggering, the word we're looking for is misappropriated. That's the definition, and you've got to go to the definitions in the statute. If you go to the definition... We only have about a minute and 20 seconds left, and I haven't heard a whole lot about the customer list. And what I heard your friend on the other side say is that there's no customer list actually in the record. And I asked the follow-up question as to whether or not that was sought in discovery. He said yes, but they never received an actual customer list. But that is still a part of your claim. Sure. That's one of four different trade secrets, but you are correct, Your Honor. I was under the impression that they had attached it to their summary judgment. We were looking. We were unable to find the location this afternoon, but all I can say is I believe it's in the record. I apologize. I don't have the citation handy on the customer list. And I do want to clarify, there are different lists. There is a... We actually called it the client list, but I don't think it matters. There's the client list, and then there's also a member database that has all kinds of other information, like personal information, because the applicants actually have to create a login, a unique login profile, and apply to be a member of Apple. And that's also information that we believe was misappropriated. But going back to the definition of misappropriation, it says... One of the ways you can do it, the first prong is improper acquisition. And I have 10 seconds left, so I'll just finish this. The second prong, alternative, it's a disjunctive or, is disclosure or use. So this whole concept, and this will be my last sentence, that you have to show use is contrary to the plain language of the statute. Thank you very much, counsel. I think we have your argument. And with that, we will take the case under submission, and we will stand in recess.